# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| AMNET ESOP CORPORATION d/b/a AMERICAN MORTGAGE NETWORK, : : : : | Civil Action 2:23-cv-00010-RWS |
| Plaintiff, : | |
| v. : : | |
| CROSSCOUNTRY MORTGAGE, INC., SPENCER THOMAS, and WILLIAM MYERS : : : : | |
| Defendants. : : | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff AmNet ESOP Corporation d/b/a American Mortgage Network ("AmNet" or the "Company"), by way of its Complaint against CrossCountry Mortgage, Inc. ("CrossCountry"), Spencer Thomas ("Thomas"), and William Myers ("Myers") (collectively, the "Defendants") states as follows:

## PRELIMINARY STATEMENT

AmNet brings this action against Defendants for intentional interference with contractual and prospective economic relations, breaches of contract and other common law duties, the use of false representations and misrepresentations to pass off their services as those of AmNet in violation of the Lanham Act and violations of state and federal law protecting trade secrets and confidential information.

CrossCountry solicited Thomas, an AmNet employee to join its employ, usurp confidential information from AmNet to CrossCountry for its benefit and divert numerous loans. Thomas accepted a position with CrossCountry before leaving AmNet's employ and used his final months to improperly divert loans to CrossCountry. Thomas spent this time appearing to work for the benefit of AmNet, all while transferring his pipeline of loans and referrals to CrossCountry.

CrossCountry was not merely aware of these actions, it was facilitating and encouraging these actions. Throughout his final weeks at AmNet, CrossCountry employees were assisting Thomas in his diversion of loans. The following allegations set forth the relevant and supportive facts:

## **PARTIES**

1.  AmNet is a licensed mortgage lender incorporated under the laws of the State of Delaware with its headquarters and principal place of business located at 347 3rd Avenue, Chula Vista, California 91910.

2.  CrossCountry is a licensed mortgage lender incorporated under the laws of the state of Ohio with its headquarters and principal place of business located at 6850 Miller Road, Brecksville, Ohio 44141.

3.  Defendant Thomas is an adult individual and resident of the State of Georgia, residing at 2373 Bronze Oak Lane, Braselton, Georgia 30517. Defendant Thomas was employed by AmNet as a branch manager and senior loan officer.

4.      Defendant Myers oversees and heads the "Transition Desk" for CrossCountry and is responsible for developing and maintaining the practices complained of herein.  Defendant Myers at all times had the opportunity to implement practices and procedures to avoid the theft of trade secrets and other properties of competitors as complained of herein.  Instead, he maintains operations designed to incentivize, encourage, facilitate and assist loan officers to steal the confidential information and trade secrets of their current employers for CrossCountry's financial benefit. Defendant Myers thus orchestrated and oversaw the pattern and practice of activities CrossCountry and Thomas engaged of herein.

## JURISDICTION AND VENUE

5.      Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. §§ 1331 and 1367 as the claims arise under the laws of the United States.

6.      In the alternative, jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and the citizenship of Defendants is diverse from that of the Plaintiff.

7.      This Court has personal jurisdiction over Thomas because he is a resident of the State of Georgia.

8.      This Court has personal jurisdiction over CrossCountry because of its intentional contacts with the State of Georgia. Specifically, CrossCountry has continuous and systematic contact with Georgia and regularly conducts business in

Georgia through its branch locations in Alpharetta, Suwanee, Kennesaw, Smyrna, Roswell, Senoia, Newnan, and Columbus, Georgia.

9.     In addition, CrossCountry has contacts arising from AmNet's causes of actions whereby CrossCountry intentionally engaged in tortious conduct aimed at the State of Georgia to benefit its operations and increase the volume of lending at its branches located in Georgia.

10.     This Court has jurisdiction over Defendant William Myers for overseeing and implementing an enterprise of racketeering activity that has engaged in tortious activity and caused tortious injury within the state.

11.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claims asserted herein occurred in this District, and Defendants are subject to jurisdiction in this District.

## FACTS

### AmNet and Defendant Thomas

12.     In August 2019, AmNet hired Thomas as a Branch Manager / Senior Loan Officer.

13.     Thomas executed an Employment Agreement with AmNet at the inception of his employment setting forth the terms and conditions of his employment, as well as post-termination obligations and restrictions.

14.     A true and accurate copy of Thomas's Employment Agreement is attached hereto as Exhibit A.

15.     Pursuant to this agreement, Thomas agreed to "devote his [] full time and attention to the affairs of the Company", not to engage in activities that, "directly or indirectly, compete with the Company", "to refrain from divulging or disclosing any [AmNet] Confidential Information to other and from using such Confidential Information, except for the benefit of the Company", and "to refrain from taking any other actions that would tend to destroy or reduce the value of the Confidential Information to [AmNet]."[1]

16.     The post-termination obligations and restrictions provided in these agreements state that Thomas is not permitted to: disclose or use any confidential materials, solicit, hire, or attempt to hire, or induce or attempt to induce to leave the Company any person who was employed or engaged by the Company during his employment and for a period of one (1) year thereafter.[2]

---

[1] Exhibit A, ¶¶ 3, 10
[2] Exhibit A, ¶¶ 10, 13.

17.    Thomas was legally obligated to protect AmNet's confidential information and trade secrets and its borrowers' non-public information.

18.    Thomas was subject to requirements of the Department of Housing and Urban Development and the National Mortgage Licensing System and required to work for only one lender and to properly disclose to borrowers the lender with whom the borrowers were engaged.

19.    Thomas was entrusted with AmNet's leads, customer loan applications, marketing strategies, consumer and loan lists, consumer identifying and financial information and pricing information, and were expected to use such resources to originate loans to be funded by and through AmNet.

20.    Moreover, such information was to be maintained exclusively for AmNet's benefit and was not to be disclosed outside of AmNet.

21.    A borrower who is using or considering using AmNet's services provides AmNet with a wide variety of personal and confidential information, including Social Security numbers, dates of birth, contact information, sensitive credit history, wage statements, bank account numbers, mortgage amounts, tax returns, and all the financial information that is necessary to facilitate a home loan.

22.    AmNet's prospective customers provide this highly sensitive private and confidential information with the understanding AmNet will protect it. AmNet is

required to maintain the privacy of this information by extremely strict federal laws that carry substantial penalties if violated.

23.    AmNet does not release, share, or disclose such confidential information to the general public.  AmNet maintains the secrecy of this confidential information and derives an economic and competitive advantage from maintaining the secrecy of such information.

24.    There is also significant commercial value to this information. Whereas lenders spend millions of dollars aggregately on leads, a lender typically has far more information on an active file – even before application – than any lead.  For instance, even if there is simply a pre-approval obtained before application, a lender will know credit scores, debt to income ratios, and the potential borrowers actual interest in pursuing a mortgage. Thus, the information and knowledge possessed by AmNet carries significant commercial value that is lost if disclosed to another lender.

25.    Indeed, if a competitor obtains this information, it undercuts AmNet on AmNet's loans and diverts AmNet's consumers by aggressively pursuing those consumers based on the information kept by AmNet.

**Thomas Leaves for CrossCountry**

26.    On or around May 2022, Thomas began secret discussions with CrossCountry to leave AmNet and work for CrossCountry.

27.    CrossCountry is a mortgage lender that solicits, originates, processes and then funds residential mortgage loans.  Upon closing of the loan, CrossCountry either services and/or sells those mortgages on the secondary mortgage market.  Its normal channel for origination of mortgage loans is through its employee loan officers who are licensed with the Nationwide Mortgage Licensing System ("NMLS") to solicit and originate residential mortgage loans.  Its normal practice is to originate loans through loan officers licensed to it through NMLS, process, close and fund those loans, and then service or sell those loans on the secondary mortgage market.

28.    Mortgage loan officers are able to originate and close loans utilizing CrossCountry's systems, processing staff, funds for lending, its state lending licenses and its business relationships that enable the sale of these loans.  Licensed activities for loan officers include any discussion with borrowers about potential loan scenarios and any discussions facilitating or relating to those loan scenarios.

29.    Until his departure in August 2022, with CrossCountry's and, upon information and belief,  Myers' knowledge and encouragement, Thomas diverted AmNet borrowers to CrossCountry utilizing the practices, procedures and instrumentalities implemented and supervised by Myers to facilitate Thomas' theft of competitors' trade secrets.

30.    AmNet has reviewed its Loan Operating System and the majority of the loans identified herein were not closed with AmNet.

8

31.    For example:

    a.  On August 18, 2022, Thomas, while he was still employed by AmNet, received an email indicating that he was working on a loan at CrossCountry and that borrower information was being provided to CrossCountry. This loan did not close with AmNet.

    b.  On August 1, 2022, borrower Whirrell was pre-approved by Thomas on behalf of AmNet. Thomas then diverted AmNet borrower Whirrell to CrossCountry while Thomas was still employed by AmNet. This loan did not close with AmNet.

    c.  On May 25, 2022, borrower Adams submitted a loan application to AmNet. This loan did not close with AmNet. Rather, this loan closed with CrossCountry.

    d.  On June 1, 2022, borrower Hale submitted a loan application to AmNet. This loan did not close with AmNet. Rather, this loan closed with CrossCountry.

    e.  On July 18, 2022, borrower Deitzler submitted a loan application to AmNet. This loan did not close with AmNet. Rather, this loan closed with CrossCountry.

   f.  On July 27, 2022, borrower Di Pento submitted a loan application to AmNet. This loan did not close with AmNet. Rather, this loan closed with CrossCountry.

32.   Myers oversaw and implemented a "Transition Desk." Although the purpose of the Transition Desk was ostensibly to facilitate the onboarding of loan officers who had decided to join the Company from other lenders, Myers utilized the Transition Desk for unlawful reasons. The purpose of the Transition Desk under Myers' direction was to encourage and assist loan officers employed and licensed with competitors to misuse their licensure and employment with competitors to gain access to trade secrets and secretly engage in licensed activities on behalf of CrossCountry during the transition process while such persons were not licensed with CrossCountry.

33.   Thomas diverted these loans with the assistance and encouragement of Myers' Transition Desk, a specific department managed by Myers. At all times Thomas remained licensed with AmNet, held out to the public and AmNet that he was exclusively licensed with AmNet, and used his position of trust and confidence with AmNet to obtain access to sensitive information and divert trade secrets, borrowers and loans to CrossCountry without being licensed with CrossCountry at such times. Myers had knowledge of the foregoing and maintained and managed

the Transition Desk to specifically foster and facilitate these unlawful purposes as more fully described herein.

34.    Cari Lapinski, a loan officer assistant, and Amber Schuiteman, a senior processor at CrossCountry, are just some of the CrossCountry employees who directly assisted in Thomas's unlawful loan diversion.

35.    Moreover, during this time and while still employed by AmNet, Thomas was actively recruiting AmNet's employees, as well as other candidates, to join CrossCountry.

36.    Following his departure from AmNet, Thomas continued to attempt to recruit AmNet's employees.

37.    According to CrossCountry's website, Thomas is now a loan officer at its Alpharetta branch.

38.    At all times, CrossCountry and Myers were aware of Thomas's contractual and legal obligations to AmNet.

39.    CrossCountry's behavior was part of a pattern and practice implemented and overseen by Myers and the Transition Desk he oversees, to unlawfully divert loans from competitors using their employees during such times that they are licensed to the unwitting competitors.

40.    After CrossCountry successfully recruited loan officers, Myers would encourage the loan officers to remain employed at their prior employer to allow them

to siphon pending leads and loan opportunities, pending loans, and private borrower information to CrossCountry, and then loans would be handled in accordance with CrossCountry's normal procedures.  In doing so, Myers utilized loan officers who were not licensed with CrossCountry to surreptitiously engage in origination on behalf of CrossCountry by engaging with borrowers to discuss potential loan scenarios with CrossCountry.  At all times, Myers knew this action required licensure with CrossCountry, and that the use of unlicensed transitioning loan officers to poach clients and trade secrets from competitors was in violation of state and federal laws.

41.    Myers implemented policies and procedures to use the Transition Desk as an instrumentality to facilitate the theft of loans through unlicensed loan officers,[3] and the theft of opportunities and private borrower information from competitors by establishing policies, practices, and procedures and creating incentives for Transition Desk staff to knowingly break federal and state lending laws and participate in the theft of competitors' trade secrets. Unlicensed transitioning loan officers would funnel loans and information to the Transition Desk loan officers supervised by Myers, who would in turn effectuate the theft and then pass the stolen loans and

[3] As used herein the term unlicensed transitioning loan officers is not intended to convey that the individual loan officers are unlicensed.  Rather, it refers to the requirement that these loan officers' licenses be associated with CrossCountry before they engage in lending activities on its behalf. As alleged herein, far from being associated with CrossCountry, these unlicensed transitioning loan officers remain associated with their prior employers from a licensing standpoint despite the fact that they are actively originating, albeit surreptitiously, for CrossCountry as a result of Myers' plans and protocols.

information on to CrossCountry's systems to be originated by CrossCountry in its name and in the names of the Transition Desk loan officers.

42.    The Transition Desk is a separate department overseen and managed by Myers that has been used to divert loans and trade secrets from numerous competitors as well, such AnnieMac, LoanDepot, Freedom Home Loans and Caliber Home Loans, among others, through the efforts of these unlicensed transitioning loan officers. *See American Neighborhood Mortgage Acceptance Company, LLC v. CrossCountry Mortgage, Inc.*, Case No. 2:20-cv-00874 (D. N.J. 2020); *LoanDepot.com LLC v. CrossCountry Mortgage, Inc.*, Case No. 2:18-cv-12091 (D. N.J. 2018); *Freedom Mortgage Corporation v. CrossCountry Mortgage, Inc.*, Case No. 1:17-cv11528 (D. N.J. 2017); *Freedom Mortgage Corporation v. CrossCountry Mortgage, Inc.*, Case No. 2:18-cv-5783 (E.D. N.Y. 2018); *Freedom Mortgage Corporation v. CrossCountry Mortgage Inc.*, Case No. 2:18-cv-00270 (D. Nev. 2018); *Caliber Home Loans v, CrossCountry Mortgage*, Case No. 2:22-cv-00616-RAJ (W.D. Wash.).

43.    William Myers heads the Transition Desk as well as the group of loan officers who work within the Transition Desk to assist in diverting and transferring loans by placing those loans in their names and then facilitating CrossCountry's closure of the loans based on trade secrets obtained from the unlicensed transitioning loan officers.

44.    William Myers reports to Craig Montgomery, the Chief Production Officer. Upon information and belief, Montgomery, who joined CrossCountry at the same time as William Myers, has at all relevant times overseen William Myers in his work supervising the Transition Desk.

45.    Myers is sufficiently experienced in the industry and fully aware of the illegal nature of the conduct he oversees, instructs and implements.  Specifically, he is generally aware of the value of the trade secrets he is diverting from competitors through his Transition Desk, aware of the fact that federal and state laws prohibit obtaining nonpublic information without consumer consent, and that lending laws prohibit unlicensed transitioning loan officers from engaging in licensed activities on behalf of a lender with whom the loan officer has not affiliated under the Nationwide Mortgage Licensing System.

46.    Further, Myers knows or should know of the potential harm to consumers associated with incentivizing and encouraging loan officers to siphon opportunities and pending loans from their then-current employers. Indeed, loan officers encouraged to siphon off those loans can cause borrowers delays putting them at contractual risk, and create the risk that borrowers' terms might change, and/or that factors affecting their eligibility could switch as a result of a loan officers' actions.

47.    Yet, Myers has consciously ignored the risks to consumers, and federal and state lending laws, all for the purpose of enriching himself and CrossCountry through

the diversion of trade secrets by using the Transition Desk loan officers to facilitate unlicensed transitioning loan officers to steal loans and competitors' trade secrets.

48.     At Myers' direction and with his oversight, Myers directly and/or indirectly encouraged employees of AmNet to use the Transition Desk as an instrumentality to transition their loans by electronically transmitting confidential and non-public information from AmNet to the Transition Desk, where it was then placed in the Transition Desk loan officers' names, and provided to CrossCountry for processing and closure. This ensured that unlicensed transitioning loan officers could divert their pipeline of loans from AmNet to be closed with CrossCountry, while they were still employed by AmNet. *Id.*

49.     Myers also utilized the Transition Desk to aid employees of Loan Depot in diverting their loans to CrossCountry. *LoanDepot.com LLC v. CrossCountry Mortgage, Inc.*, Case No. 2:18-cv-12091 (D. N.J. 2018).

50.     Currently, there are approximately nine (9) loan officers who work with the Transition Desk under Myers' attention and management. Among them are Jonathan Wick, Daniel Jordan Gourash, Cody Bertke, Kenneth Todd VanCleave and Brian Vollmer. These loan officers spend a substantial portion of their time moving loans and trade secrets from unlicensed transitioning loan officers while they are in the process of joining CrossCountry.

51.    Myers' Transition Desk similarly encouraged and facilitated employees of Freedom mortgage to unlawfully divert loans from Freedom to CrossCountry through employees that CrossCountry was actively soliciting, while those individuals were still employed by Freedom. *Freedom Mortgage Corporation v. CrossCountry Mortgage, Inc.*, Case No. 1:17-cv11528 (D. N.J. 2017); *Freedom Mortgage Corporation v. CrossCountry Mortgage, Inc.*, Case No. 2:18-cv-5783 (E.D. N.Y. 2018); *Freedom Mortgage Corporation v. CrossCountry Mortgage Inc.*, Case No. 2:18-cv-00270 (D. Nev. 2018).

52.    Myers' Transition Desk engaged in similar practices with respect to unlicensed transitioning loan officers leaving Caliber Home loans to join CrossCountry.  These loan officers were incentivized to divert information about borrowers and pending loans to CrossCountry, in some cases without the borrowers' knowledge, after CrossCountry successfully recruited them to join the Company. Caliber claims these activities caused it to lose $2.3 billion in loan origination volume.  *See Caliber Home Loans v, CrossCountry Mortgage*, Case No. 2:22-cv-00616-RAJ (W.D. Wash.).

53.    At Myers' direction and with his oversight, the Transition Desk has also been engaged in similar actions with respect to unlicensed transitioning loan officers leaving Guild Mortgage. In a complaint filed in the Western District of Washington, Guild cites to dozens of examples where its loan officers – while still employed by

Guild, began transferring information about borrowers, transitioning and soliciting borrowers – with and without their knowledge and permission – to switch their application to CrossCountry while these employees remained employed and licensed by Guild. *Guild Mortgage Company v, CrossCountry Mortgage Company LLC*, Case No.: 2:21-cv-01376-JCC. These actions were, upon information and belief, initiated by and through Myers' Transition Desk team.

54.    Another lender, loanDepot, has sued CrossCountry alleging that:

> Through CrossCountry's onboarding and recruitment activities, CrossCountry
>> orchestrated the resignation of Defendants [Employees] … and facilitated the breach of their duty of loyalty and contractual obligations, by among other things … their expedited removal of confidential client information and files, and the conversion of loanDepot customers to CrossCountry customers; providing a "migration team" dedicated to their transition; facilitating the improper transfer of loanDepot customers to CrossCountry through a "referral desk" and "referral" staff and personnel;

55.    These analogous complaints and accusations are not merely an unfortunate pattern of activity by Myers whose actions benefit both himself and CrossCountry. Rather, Myers has established and/or maintained written policies and procedures that formally facilitate and encourage unlicensed transitioning loan officers, while employed at and licensed with a competitor, to send confidential information, trade secrets and customers from their current employer to CrossCountry. Indeed, Myers has utilized teams of CrossCountry loan officers specifically to facilitate the transition and transfer of loans from competitors using unlicensed transitioning loan

officers as CrossCountry's agents despite the fact that those loan officers remain licensed with and employed by competitors.  All of these actions were consistent with the pattern, practice, role and usage of the Transition Desk managed and implemented by Myers.

56.    In taking these actions, CrossCountry and Myers are aware that their competitors, such as AmNet, Annie Mac, loanDepot, Caliber Home Loans, Freedom Mortgage and other entities have proprietary and trade secret rights to the borrower information, that federal licensing laws prohibit these loan officers from simultaneously working for other lenders, and that federal laws are intended to avoid borrower confusion so that borrowers know the lender with whom a loan officer is affiliated.  Myers and CrossCountry are also aware of the value of pending customers and applications with a lender and that such information is protected from public disclosure, meaning that CrossCountry would never learn of these borrowers, obtain access to their information, or have the chance to divert those borrowers but for creating and maintaining the misrepresentation that CrossCountry's newly hired loan officers remained trusted loyal employees of their soon to be former employers and CrossCountry competitors.

57.    Myers' "Transition Desk" is literally dedicated to instructing, incentivizing, encouraging, facilitating and assisting loan officers to remain with their employer to misrepresent their loyalty and licensure status, and conceal the fact that they are

actually working for the benefit of CrossCountry, all for the purpose of gaining access to and diverting proprietary information, trade secrets and customers from other lenders. Upon information and belief this is for Myers' and CrossCountry's collective benefit.

58.     Defendant Myers is responsible for overseeing the complete operations of the Transition Desk and maintaining practices intentionally and specifically designed to facilitate the theft of competitors' trade secrets.  Myers is also responsible, upon information and belief, for either directing the unlicensed transitioning loan officers to engage in the unlawful activity and/or causing communications to be sent to the unlicensed transitioning loan officers to encourage and facilitate such unlawful activity.

59.     Defendant Myers' unlawful practices were facilitated by Defendant CrossCountry, such that both Myers and CrossCountry have acted with knowledge of their unlawful actions for the common purpose of enriching themselves and one another, and form an unlawful enterprise with a common purpose under the Racketeer Influenced and Corrupt Organizations Act.

60.     Myers and CrossCountry are also well aware of the type of employment agreements that branch managers and loan officers in the mortgage industry typically have, as both have been involved in litigations for interfering with them previously.

61.    In fact, CrossCountry has even provided legal advice to loan officers who it is soliciting from competitors and who CrossCountry is helping to divert loans and poach employees, and offered those loan officers indemnity should their previous employers bring actions against them for their unlawful activity. *Homeside Financial, LLC v. CrossCountry Mortgage Inc., et al.*, Case No. 8:18-cv-02639 (D. Md. 2018).

62.    The same pattern of activity occurred when CrossCountry recruited Thomas. Myers, through his Transition Desk, provided Thomas with encouragement, knowledge and assistance to unlawfully divert loans from AmNet, for his and CrossCountry's benefit while he was an unlicensed transitioning loan officer.

63.    Through his illegal actions Myers has benefitted himself by, upon information and belief, increasing the volume of loans handled through the Transition Desk, increasing his compensation both directly and indirectly.  Moreover, Myers' actions benefit CrossCountry, which receives revenues on the diverted loan opportunities, and access to and use of competitors' trade secrets.

64.    To date, AmNet is aware of approximately 15 loans that Thomas, as a result of Myers' unlawful activities and schemes, diverted to CrossCountry while he was an unlicensed transitioning loan officer, worth approximately $7 million.

## <u>COUNT ONE – BREACH OF CONTRACT</u>
### (Against Defendant Thomas)

65.     AmNet repeats and realleges its allegations in Paragraphs 1 - 64 as if set forth in their entirety herein.

66.     In his employment agreement, Thomas agreed to the restrictive covenants that prohibit him from usurping and disclosing AmNet's confidential information and from improperly disclosing and/or transferring non-public borrower information.

67.     Pursuant to his employment agreement, Thomas was contractually obligated not to disclose any of AmNet's confidential information.

68.     Thomas breached his confidentiality obligations to which he agreed by disclosing and misappropriating AmNet's confidential information for his own benefit and the benefit of CrossCountry.

69.     As a result of Thomas's violations of his contractual obligations, AmNet has suffered monetary losses and will continue to suffer these losses going forward due to lost business and good will.

## COUNT TWO – BREACH OF FIDUCIARY DUTY/ DUTY OF LOYALTY
(Against Defendant Thomas)

70.     AmNet repeats and realleges its allegation in Paragraphs 1 - **Error! Reference source not found.**69 as if set forth in their entirety herein.

71.     As an employee of AmNet, Thomas owed a duty of loyalty to AmNet during the term of his employment, which prohibited the solicitation of AmNet's customers for his own benefit while still employed.

72.    Thomas further breached his duty of loyalty to AmNet by soliciting its employees to leave AmNet and work for CrossCountry, while they were still employed by AmNet, as well as diverting customers from AmNet and usurping business opportunities in direct competition with AmNet.

73.    These actions were orchestrated and undertaken by Thomas while an employee of AmNet, to which he owed duties of loyalty and fair dealing.

74.    As a result, AmNet has suffered and will continue to suffer damages associated with Thomas' wrongful actions.

## COUNT THREE – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(Against CrossCountry)

75.    AmNet repeats and realleges its allegation in Paragraphs 1-74 as if set forth in their entirety herein.

76.    Thomas committed violations of his fiduciary duties while acting at CrossCountry's instructions, with CrossCountry's full support and encouragement.

77.    CrossCountry incentivized, encouraged and facilitated Thomas to Breach his fiduciary duty by providing the instrumentalities to divert borrowers to CrossCountry while he was employed by AmNet.

78.    The actions of CrossCountry facilitated, assisted and encouraged the Thomas to breach his fiduciary duties and rewarded such breaches of fiduciary duty.

79.     CrossCountry's unlawful conduct has caused AmNet damages and AmNet will continue to suffer irreparable injury.

### COUNT FOUR
### VIOLATION OF THE LANHAM ACT, 15 U.S.C. 1125(a)
(Against Defendants Thomas and CrossCountry)

80.     AmNet repeats and realleges its allegations in Paragraphs 1 - 79 as if set forth in their entirety herein.

81.     Thomas made material misrepresentations to numerous consumers that the consumers were engaging in transactions with AmNet, and that AmNet would maintain their confidential information and originate, process and close their transactions.

82.     Thomas also misrepresented to consumers and potential consumers that he was engaging in and undertaking such transactions as a representative and agent of AmNet, whey he was actually working on behalf of CrossCountry.

83.     Specifically, Thomas maintained in his NMLS profile his active licensure with AmNet and provided business cards, email signatures and various other instrumentalities representing he was an AmNet loan officer when in fact he was at all relevant times acting for the benefit of CrossCountry.

84.     Thomas was required under federal law to disclose to the public the actual lender with whom he worked, specifically to avoid consumer confusion. Instead of

complying with such laws, he maintained a false and deceptive license that concealed his true employment with and for the benefit of CrossCountry.

85.    CrossCountry was not only aware of these misrepresentations but encouraged and perpetuated them.

86.    CrossCountry employees communicated with borrowers who began their loans with Thomas at AmNet, asking for borrower information or communicating about the loan process, while Thomas was still an AmNet employee.

87.    In addition, the CrossCountry employees were asking AmNet borrowers for additional information so that CrossCountry, not AmNet, could close their loans.

88.    Thomas's communications with such customers used and displayed AmNet's licensing information specifically designed to allow borrowers to look up its NMLS license number to ascertain the Company's regulatory and legal history.

89.    Unbeknownst to AmNet's customers, Thomas was interacting with the customers with the intention of diverting them – and in fact, did so divert many of them – to CrossCountry, an AmNet competitor.

90.    This caused and continues to cause confusion among the consumers as to which company was providing them with a mortgage loan.  It created scenarios where borrowers – lured in under AmNet's reputation as reflected by its NMLS license number – were without their consent diverted to CrossCountry.

91.     Moreover, information specifically entrusted to AmNet by consumers was surreptitiously provided to CrossCountry by Thomas, without Borrowers' consent to enable CrossCountry to begin processing and underwriting these loans.

92.     CrossCountry and Thomas have been unjustly enriched as a direct and proximate result of their wrongful acts, and AmNet has suffered damages in an amount not yet fully determined.

93.     As a direct result of CrossCountry's actions, AmNet has been harmed and continues to be irreparably harmed by the loss of business and goodwill in the marketplace and consumers harmed through CrossCountry's material misrepresentations.

94.     The foregoing acts constitute unfair competition in violation of Section 43(a) of the Lanham Act.

95.     CrossCountry and Thomas have acted knowingly, willfully, and in conscious disregard of the rights of their consumers, AmNet, and the general public.

**COUNT FIVE**
**TORTIOUS INTERFERENCE WITH CURRENT CONTRACTUAL AND PROSPECTIVE ECONOMIC RELATIONS**
(Against Defendants Thomas and CrossCountry)

96.     AmNet repeats and realleges its allegations in Paragraphs 1-95 as if set forth in their entirety herein.

97.     AmNet had contractual relationships with borrowers for whom it was originating mortgage loans and AmNet derived profit from these relationships.

98.    CrossCountry was aware of these relationships because it encouraged Thomas to disclose them and bring the borrowers to CrossCountry.

99.    Because of their relationships, Thomas was able to divert these customers and their loans to CrossCountry, for the benefit and profit of CrossCountry.

100.    AmNet had a reasonable expectation of future business relationships with potential consumers who indicated an interest in engaging AmNet's services by filling out a loan application or otherwise proceeding with the process for obtaining a mortgage.

101.    There was a reasonable probability that AmNet and these potential consumers would have entered into one or more contractual relationships because they provided their contact information or submitted applications to AmNet with the goal of obtaining a loan.

102.    Defendant CrossCountry knowingly and purposefully facilitated Thomas in diverting his pipeline of loans from AmNet to CrossCountry.

103.    CrossCountry engaged in these activities, fully aware of the actual and prospective business relationships using malicious and unlawful conduct to facilitate the diversion and interference of AmNet's actual and prospective business relationships as alleged herein.

104.    AmNet has suffered harm through the lost profits, loss of business and goodwill in the marketplace and with consumers due to CrossCountry's misconduct.

## COUNT SIX
## <u>UNFAIR COMPETITION</u>
(Against Defendants Thomas and CrossCountry)

105.  AmNet repeats and realleges its allegations in Paragraphs 1 –104 as if set forth in their entirety herein.

106.  CrossCountry, through Thomas, solicited AmNet's employees, diverted its customers and usurped AmNet's confidential information, including borrower and referral lists and confidential borrower and referral personal information.

107.  CrossCountry and Thomas did this maliciously, surreptitiously and with the intent to effectuate their scheme without AmNet's knowledge.

108.  CrossCountry engaged in this misconduct for the purpose of directly and unfairly competing with AmNet and stealing its customers and business opportunities.

109.  As a direct result of CrossCountry's and Thomas's actions, AmNet has suffered damages and continues to be harmed in the loss of business and goodwill in the marketplace.

## COUNT SEVEN
## <u>MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF NEW JERSEY UNIFORM TRADE SECRETS ACT</u>
(Against All Defendants)

110.  AmNet repeats and realleges its allegations in Paragraphs 1 – 109 as if set forth in their entirety herein.

111.   AmNet devises independent economic value from its list of potential and actual customers and non-public borrower information, information which is not generally known, and AmNet took reasonable measures to maintain and protect the secret nature of the information.  As such, the lists constitute trade secrets under Georgia's Uniform Trade Secrets Act.

112.   Thomas was entrusted with this confidential and proprietary information in the performance of his job.

113.   At CrossCountry's behest, Thomas improperly and unlawfully accessed and disclosed these trade secrets to CrossCountry and CrossCountry utilized such trade secrets in breach of applicable law and duties, all to AmNet's detriment.

114.   CrossCountry's actions directly caused AmNet harm through the lost profits and loss of current and future business and good will.

115.   Unless AmNet is made whole through damages attributable to business and good will lost, CrossCountry's conduct has and will continue to cause AmNet harm.

**COUNT EIGHT**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C.§ 1836 et seq.**
(Against Defendants Thomas and CrossCountry)

116.   AmNet repeats and realleges its allegations in Paragraphs 1 - 115 as if set forth in their entirety herein

117.   The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3), defines a trade secret as, inter alia, "all forms and types of financial, business, scientific,

technical, economic, or engineering information … whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" – provided that the owner took "reasonable measures to keep such information secret," and it offers the holder of the trade secret and advantage over competitors who do not know or use the trade secret.

118.   AmNet's list of potential and actual customers and non-public borrower information were kept secret by substantial measures undertaken by AmNet to protect the secret and private nature of the information.

119.   AmNet's trade secrets are related to products and/or services used in interstate commerce.

120.   Thomas entrusted with this confidential and proprietary information in the performance of his job.

121.   At CrossCountry's direction, Thomas improperly and unlawfully accessed and disclosed these trade secrets to CrossCountry, which knew or had reason to know that these trade secrets were acquired by improper means.

122.   CrossCountry utilized such trade secrets in breach of applicable law and duties, without AmNet's express or implied consent, all to AmNet's detriment.

123.   CrossCountry's actions directly caused AmNet harm through the loss of current and future business and good will.

124.    Unless AmNet is made whole through damages attributable to business and good will lost, CrossCountry's conduct has and will continue to cause AmNet harm.

### COUNT NINE
### CIVIL RICO 18 U.S.C. §§ 1961-1968, et seq
(Against Defendants CrossCountry and Myers)

125.    AmNet repeats and realleges its allegations in Paragraphs 1 - 124 as if set forth in their entirety herein.

126.    Defendants have committed a series of predicate acts – including wire fraud (18 U.S.C. § 1343), interstate transportation of money taken by fraud (18 U.S.C. § 2314), and fraud against a financial institution (18 U.S.C. § 1344) – by stealing AmNet's and other mortgage lenders' trade secrets and proprietary information in violation of the Defend Trade Secrets Act in violation of 18 USC §1962.  Further, Defendants have utilized mails and wires to perpetrate a fraud for purposes of obtaining access to competitors' trade secrets and diverting the value and benefit of those trade secrets for CrossCountry's own unlawful purposes.

127.    Defendants Myers and CrossCountry have maintained and overseen a pattern of racketeering activity by maintaining a deliberate system and infrastructure to steal trade secrets from other competitors, incentivizing teams of unlicensed transitioning loan officers using deceptive means and instrumentalities to gain access to competitors' trade secrets and divert loans and trade secrets to CrossCountry.

128.   Defendant Myers oversees and commands the Transition Desk, maintaining and implementing practices that are intentionally designed to cause unlicensed transitioning loan officers to steal trade secrets from competitors before they leave their employment.

129.   CrossCountry recruits loan officers who, with Myers' encouragement and assistance, then engage in the illegal theft of trade secrets while unlicensed with CrossCountry during their period of transition.  CrossCountry then further assists by acting as a vehicle to close the loans obtained through Myers' theft of trade secrets. CrossCountry and Myers thus form an enterprise by separately engaging in actions that in association with one another form a criminal enterprise intended to encourage and facilitate unlicensed transitioning loan officers to steal competitors' trade secrets and allow both CrossCountry and Myers, upon information and belief, to respectively profit therefrom.

130.   CrossCountry and Myers are acutely aware of the importance and value of a lender's pending loan files and nonpublic customer information.

131.  Yet, Myers oversees and maintains a formal process to instruct unlicensed transitioning loan officers to remain employed with a competitor so that they can maintain access to the competitor's trade secrets for the purpose of diverting them to CrossCountry.

132.   CrossCountry facilitates Myers' activities by recruiting the loan officers, providing the instrumentalities to process and close loans derived through the theft of trade secrets, and providing the infrastructure necessary for the theft of trade secrets and loans through Myers' Transition Desk.  At all times CrossCountry is aware of its facilitation of the illegal activities conducted by Myers' Transition Desk.

133.   Defendants have received economic benefit from and damaged competitors, including AmNet, through their illegal actions as described herein.

134. Defendants Myers and CrossCountry have not only engaged in predicate acts but have conspired to do so in the future by Myers' ongoing operation of the Transition Desk and CrossCountry's recruiting of loan officers and facilitation, processing, funding and closure of loans.  The loans were only possible as a result of the theft of trade secrets through the Transition Desk's use of unlicensed transitioning loan officers whom Myers has directly and indirectly encouraged to steal CrossCountry's competitors' trade secrets.

135.   Defendants Myers and CrossCountry have engaged in this pattern of unlawful activity to steal trade secrets and proprietary information from multiple lenders nationwide, and Defendants will continue to engage in such actions unless the pattern of unlawful conduct is addressed.

136.   Defendants Myers and CrossCountry have caused harm and damage to AmNet by encouraging  and enabling Thomas to divert and steal AmNet's trade secrets so the information could be used for Defendants' economic benefit.

**COUNT TEN**
**CONSPIRACY**
(Against All Defendants)

137.   AmNet repeats and realleges its allegations in Paragraphs 1 - 136 as if set forth in their entirety herein.

138.   CrossCountry, Myers, and Thomas together reached an agreement to tortiously interfere with the contractual and business relationships between AmNet and its employees, and engaged in the overt acts of diverting loans to CrossCountry while Thomas was employed by AmNet and using AmNet's facilities and resources.

139.   These overt actions in furtherance of the conspiracy to tortiously interfere with AmNet's contractual and business relationships caused AmNet damages through the loss of earnings, business and customers, and goodwill in the marketplace.

**COUNT ELEVEN**
**CONSPIRACY TO VIOLATE RICO**
(Against All Defendants)

140.  AmNet repeats and realleges its allegations in Paragraphs 1-139 as if set forth in their entirety herein.

141.    CrossCountry and Myers together reached an agreement to violate the federal RICO statute, by misappropriating the trade secrets of AmNet using the mails and wires, transporting money taken by fraud, and defrauding a financial institution. CrossCountry and Myers further engaged in the overt acts of encouraging and equipping Thomas in diverting loans to CrossCountry while Thomas was employed by AmNet, and using AmNet's facilities and resources to close those loans at CrossCountry.

142.    Defendant Myers and Defendant CrossCountry conspired to commit these predicate acts with the single objective of stealing borrower information from AmNet in violation of RICO.

143.    These agreements and overt actions in furtherance of the conspiracy to violate RICO caused AmNet damages through the loss of earnings, business and customers, and goodwill in the marketplace. These agreements and overt actions were also intended by CrossCountry and Myers, and in fact resulted in, the profit and enrichment of both CrossCountry and Myers through the closing of loans at CrossCountry instead of AmNet.

## COUNT TWELVE
## GEORGIA CIVIL RICO
(Against Defendants Myers and CrossCountry)

144.    AmNet repeats and realleges its allegations in Paragraphs 1 - 142 as if set forth in their entirety herein.

145.   A violation of Georgia's RICO Statute, codified as OCGA §16-14-3, *et seq*., provides that a pattern of racketeering is demonstrated by engaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics.

146.   The Georgia RICO Act was enacted by the Georgia legislature to impose criminal penalties against those engaged in an interrelated pattern of criminal activity motivated by or the effect of which is pecuniary gain or economic threat or injury.

147.   As set forth above, Defendants Myers and CrossCountry have engaged in an ongoing pattern of activity for a common criminal purpose with the same or similar intent of harming a class of similar victims using a similar plan and scheme.

148.   Defendant Myers's and Defendant CrossCountry's actions constitute theft under OCGA §16-8-1, *et. seq.*, and amount to a predicate act under Georgia Civil RICO Statute.

149.   Defendant Myers's and Defendant CrossCountry's actions amount to residential mortgage fraud under OCGA§ 18-8-102, in that Defendants have caused and conspired with unlicensed transitioning mortgage loan officers to misstate and misrepresent the lender with whom they are working as opposed to with whom they are licensed and have upon information and belief either misrepresented or omitted

material information in connection with their efforts to divert borrowers to CrossCountry.   Further, the unlicensed transitioning loan officers have – at Myers's direction – engaged in material misrepresentations and omissions to the lenders with whom they are licensed, in connection with the mortgage process.   Residential mortgage fraud is a predicate offense under the Georgia RICO statute.

150.  Defendants' actions amount to Computer Theft under OCGA §16-9-93, in that they have used unlicensed transitioning loan officers to gain access to computer systems and the information therein, to which Defendants know they lack proper access and authority, for the purpose of obtaining competitors' trade secrets, including loan files, borrower information, and other trade secrets.  Defendants have engaged in these actions in order to obtain competitors' information for the purpose of economic gain.

151.  Defendants Myers and CrossCountry have proximately caused harm and damage to AmNet through their respective unlawful actions which have encouraged, facilitated, and enabled Thomas to divert and steal AmNet's trade secrets for the benefit of CrossCountry and Myers.

## **PRAYER FOR RELIEF**

WHEREFORE, as to all counts, Plaintiff respectfully requests that the Court enter judgment in its favor and award the following relief against Defendants:

a. Permanently restraining Thomas from violating the restrictive covenants in his Employment Agreement, including from further disclosing AmNet's confidential information and by soliciting AmNet's employee for a period of 12 months.

b. Compelling CrossCountry and Thomas to provide an accounting of all loans that Thomas has closed, or has attempted to close by sending borrower information to CrossCountry from May 2022 to the present;

c. Disgorgement of the profits CrossCountry realized as a result of closing the loans that were improperly diverted from AmNet;

d. From all Defendants, actual and compensatory damages, including AmNet's lost profits, attorneys' fees and expenses and costs of pursuing this matter;

e. From CrossCountry, double or treble actual damages and punitive damages as appropriate;

f. All damages resulting from Thomas's unlawful conduct, including all ill-gotten compensation and benefits.

g. Interest; and

h. Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff AmNet hereby demands a trial by jury of all issues triable pursuant to

Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

MITCHELL SANDLER LLC

*/s/ Ari Karen*
Ari Karen, Esq.
1120 20th Street NW
Suite 725
Washington, D.C.
(202) 886-5260
akaren@mitchellsandler.com

*/s/ S. Gardner Culpepper*
S. Gardner Culpepper
Georgia Bar No. 201210
gculpepper@sgrlaw.com
Emma Cramer
GA Bar No. 661985
ecramer@sgrlaw.com
SMITH, GAMBRELL & RUSSELL, LLP
1105 W. Peachtree Street, N.E.
Suite 1000
Atlanta, GA 30309
Telephone: (404) 815-3500
Direct Tel: (404) 815-3548